**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| AIRGAS, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. _____ |
| -against- | : | |
| | : | |
| HUDSON HOLDINGS, INC. and | : | |
| HUDSON TECHNOLOGIES, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff Airgas, Inc. ("Airgas"), by and through its undersigned attorneys, brings this declaratory judgment action against defendants Hudson Holdings, Inc. ("Hudson Holdings") and Hudson Technologies, Inc. ("Hudson Technologies," and collectively "Hudson" or "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to determine and resolve questions of actual controversy involving the contractual rights and obligations of the parties.

2.      Defendants have demanded payment from Airgas – and alleged that Airgas is contractually obligated to pay them by no later than the date of this Complaint – in an amount determined by independent accountants RSM US LLP ("RSM") purportedly pursuant to a post-closing dispute resolution provision of an August 9, 2017 Stock Purchase Agreement ("SPA")[1] by and among the parties to this action (the "RSM Determination").  The RSM

---

[1] The SPA is attached hereto as **Exhibit 1**.  All capitalized terms not otherwise defined herein shall the meaning ascribed to such terms in the SPA.

Determination, however, went well beyond RSM's limited authority under, and directly violates, the SPA and established Delaware law, and thus this Court should declare that Airgas is under no obligation to pay the amount therein.

3.      The Delaware Supreme Court has made clear that accounting firms, acting as experts, not arbitrators, like RSM in this case, do not have a mandate to address all disputes that might arise from a stock purchase agreement.  On the contrary, settled Delaware law establishes that when the parties adopt such an expert-not-arbitrator dispute resolution procedure, it calls for a tailored procedure that assigns only narrow questions to the expert consistent with its technical expertise, while all other issues are reserved for the plenary adjudicator, which in this case is this Court under the SPA's forum selection clause.

4.      Here, under the SPA, Hudson agreed to purchase Airgas's shares of Airgas-Refrigerants, Inc. ("ARI") for the aggregate purchase price of $220,000,000.00, subject to a contractually mandated process for determining a Post-Closing Adjustment to such purchase price, if any.  Pursuant to that process, when the parties were unable to agree on certain components of the Post-Closing Adjustment, they engaged RSM to resolve such disputed items (the "Disputed Amounts").

5.      The SPA limited RSM's role to "act[] as *experts* and not arbitrators" to resolve the Disputed Amounts.  Under Delaware law, this language limited the scope of RSM's authority to deciding "*discrete factual issues within an independent accountant's expertise*." Unlike an *arbitrator*, RSM was not permitted to rule on questions of law, resolve disputes concerning the interpretation of the SPA, or decide matters outside of its accounting expertise that would otherwise be reserved for this Court, which the parties designated as the exclusive forum for resolving disputes outside of RSM's authority.  Yet, RSM did all of those things

when it issued the RSM Determination:  it purported to resolve legal disputes between the parties as to the meaning of key provisions of the SPA, and drew contested credibility and factual inferences on matters well outside its limited accounting expertise.

6.      Worse still, RSM's unauthorized legal and factual decisions were erroneous and contrary to the SPA and Delaware law.

7.      Accordingly, and for the reasons herein, Airgas seeks a declaratory judgment that it is under no obligation to pay the RSM Determination, which is contrary to the SPA and Delaware law, and thus, the RSM Determination should be declared null and void (and that any further proceeding before the independent accountants must correctly apply the SPA and Delaware law as specified below).

## PARTIES

8.      Plaintiff Airgas, Inc. is a Delaware corporation with its principal place of business in Radnor, Pennsylvania.

9.      Defendant Hudson Holdings, Inc. is a Nevada corporation with its principal place of business in Pearl River, New York.

10.     Defendant Hudson Technologies, Inc. is a New York corporation with its principal place of business in Pearl River, New York.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1332(a)(1) and 1332(c)(1).  The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

12.     Venue in this Court is proper, and this Court has personal jurisdiction over Defendants pursuant to Section 10.10(b) of the SPA, which states in relevant part:

3

ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF DELAWARE OR, IN THE EVENT THAT SUCH COURTS DO NOT HAVE SUBJECT MATTER JURISDICTION OVER SUCH LEGAL SUIT, ACTION OR PROCEEDING, IN THE CHANCERY COURT FOR THE STATE OF DELAWARE. EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

## FACTUAL BACKGROUND

**The SPA and its Relevant Provisions**

13.     On August 9, 2017, the parties executed the SPA whereby Hudson agreed to purchase from Airgas all of the issued and outstanding shares of common stock of ARI.  *See* Ex. 1, Recitals.

14.     Prior to executing the SPA, Hudson had access to a data room containing due diligence materials pertaining to ARI, and based on the materials in that data room, Hudson was not only privy to, but fully understood, ARI's accounting practices and procedures, and that ARI's historic accounting practices had been repeatedly determined to be in accordance with GAAP and audited by reputable accounting firms.

4

15.     In the SPA, Hudson agreed to purchase Airgas's shares of ARI stock for the aggregate purchase price of $220,000,000.00 (Estimated Purchase Price), subject to the Post-Closing Adjustment (as explained below).  *See* Ex. 1, § 2.02(a).

16.     At least five (5) Business Days before the Closing, Airgas was to deliver to Hudson an Estimated Closing Statement, which was to include a good faith estimate of the Closing Balance Sheet of ARI, including ARI's Estimated Closing Working Capital, Estimated Closing Indebtedness, and Estimated R-22 Value Adjustment (i.e., the inventory of ARI's "salable" R-22 Refrigerant Gas, the chief refrigerant gas supplied by ARI) as of the Closing Date, prepared in accordance with the Accounting Principles.  *See* Ex. 1, § 2.02(b).

17.     Under the SPA "Accounting Principles" was defined to mean:

> . . . GAAP applied using ***the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Annual Financial Statements for the most recent fiscal year end*** as if such accounts were being prepared and audited as of a fiscal year end.  (*See* Ex. 1, p. 1) (emphasis added).

18.     The SPA contemplated that, upon Airgas's provision of the Estimated Closing Statement, the parties would calculate a Closing Adjustment equal to (A) the Estimated Closing Working Capital, minus the Target Working Capital, plus (B) Estimated Closing Indebtedness, plus (C) the Estimated R-22 Value Adjustment, minus (D) an $800,000 credit to Hudson.  *See* Ex. 1, § 2.02(b)(ii).

19.     Pursuant to the SPA, within 180 days after the Closing Date, Hudson was to deliver a Closing Statement to Airgas, which had to include a Closing Balance Sheet, prepared in accordance with the Accounting Principles, and setting forth Hudson's calculation of Closing Working Capital and Closing Indebtedness.

20.     The Closing Balance Sheet was also to include Hudson's calculation of items referred to as the Closing R-22 Value Adjustment and Closing Disposal Adjustment—which essentially referred to Hudson's calculation of ARI's refrigerant gas inventory, adjusted to exclude, *inter alia*, certain inventory which Hudson claimed had no value because it could not be reclaimed in an economically efficient manner or without creating risk of damages to equipment or employees and cylinders that could not be reused.  *See* Ex. 1, § 2.02(c).

21.     The SPA contemplated that concurrently with Hudson's provision of the Closing Statement, Hudson would calculate a Post-Closing Adjustment equal to (A) the Closing Working Capital, minus the Estimated Closing Working Capital, plus (B) the Closing Indebtedness, minus the Estimated Closing Indebtedness, plus (C) the Closing R-22 Value Adjustment, minus the Estimated R-22 Value Adjustment, minus (D) the Closing Disposal Adjustment.  *See* Ex. 1, § 2.02(c)(iii).

22.     As the Delaware Supreme Court has emphasized, it is critically important that the Post-Closing Adjustment be calculated using the same accounting principles and methods that were used by the seller pre-Closing, given the limited purpose of such provisions:

> "[W]hen keeping the broader context in mind: it would be awfully
> difficult for the [post-closing adjustment] to fulfill one of its main
> roles, i.e., account for changes in [the] business between signing and
> closing, if one accounting approach was used to complete the
> Financial Statements for signing and another one was used to
> complete the [post-closing adjustment] calculations."  *Chicago
> Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d
> 912, 930 (Del. Supr. 2017).

23.     The SPA provided for a 45-day Review Period following Airgas's receipt of Hudson's Closing Statement.  Before the expiration of the Review Period, Airgas had the right to object to the Closing Statement and Post-Closing Adjustment by delivering to Hudson a Statement of Objections setting forth Airgas's objections by indicating each disputed item or

amount and the basis for Airgas's disagreement therewith.  Similarly, to the extent Airgas disagreed with Hudson's calculation of the amount of R-22 Inventory as inaccurate, Airgas was to set forth its objections and the underlying basis for the objections.  *See* Ex. 1, § 2.02(d)(ii).

24.     If the parties were unable to resolve Airgas's objections to the Closing Statement and Post-Closing Adjustment within 30-days of Airgas's delivery of the Statement of Objections, then any amounts in dispute (Disputed Amounts) were to be submitted for resolution to RSM pursuant to the Resolution of Disputes process outlined in Section 2.02(d)(iii) of the SPA. *See* Ex. 1, § 2.02(d)(iii).

25.      Importantly, in the SPA the parties expressly agreed that RSM was authorized to act ***only*** as an expert and ***not*** as an arbitrator in resolving any Disputed Amounts and in making any adjustments to the Post-Closing Adjustment:

> **Resolution of Disputes**.  If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then ***any amounts remaining in dispute ("Disputed Amounts" and any amounts not so disputed, the "Undisputed Amounts") shall be submitted for resolution to the applicable office of RSM US LLP . . . (the "Independent Accountants") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be***, and the Closing Statement.  (*Id*.) (emphasis added).

26.     RSM was to make its determination as soon as practicable within 30 days of being engaged unless parties agreed to a different timeframe.  The SPA further provided that RSM's resolution of the Disputed Amounts and adjustments to the Closing Statement and/or the Post-Closing Adjustment (again, so long as it acted in its limited role "as experts and not arbitrators") "shall be conclusive and binding upon the parties hereto." *See* Ex. 1, § 2.02(d)(v).

27.     The SPA provides that, if Disputed Amounts are submitted to the Independent Accountants for resolution, any payment of the Post-Closing Adjustment shall be due within ten Business Days of resolution of the dispute.  *See* Ex. 1, § 2.02(e).

28.     The SPA included a choice of forum and choice of law provision, which provides that all matters arising out of or relating to the SPA shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule, and that any legal suit, action or proceeding arising out of or based upon the SPA may be instituted in the Federal Courts of the United States of America located in Delaware or, in the event that the federal courts do not have subject matter jurisdiction, in the Chancery Court for the State of Delaware. Ex. 1, § 10.10 (a – b).

**The Post-Closing Adjustment Dispute**

29.     The Closing of the transaction governed by the SPA occurred on October 10, 2017, two months after the SPA was executed.

30.     On April 6, 2018, Hudson delivered to Airgas the Closing Statement required under Section 2.02(b) of the SPA.

31.     Following its review of the Closing Statement, on May 18, 2018 Airgas timely delivered to Hudson a written Statement of Objections, pursuant to Section 2.02(d)(ii) of the SPA. (the "Statement of Objections").

32.     In the Statement of Objections, Airgas indicated certain Disputed Amounts and set forth the basis for its objections. Additionally, Airgas objected to Hudson's inaccurate calculation of the R-22 Inventory in the Closing Statement and provided its own calculation.

33.     In its Statement of Objections, Airgas also objected on the basis that Hudson was attempting to re-account the various items in its Closing Statement using a different

accounting approach than had been used by ARI pre-Closing, and that Hudson's effort to do so violated the SPA and established Delaware law.

34.     On October 29, 2018, the parties engaged RSM to resolve the Disputed Amounts pursuant to the Resolution of Disputes process outlined in Section 2.02(d)(iii) of the SPA. (the "Post-Closing Adjustment Dispute").

35.     Throughout the Post-Closing Adjustment Dispute, Hudson repeatedly requested that RSM apply definitions of "Accounting Principles" that were inconsistent with and expressly contrary to the language of the SPA, or stated differently, to use a different accounting approach than ARI had used pre-Closing.

36.     In its Initial Submission to RSM, while attempting to distance itself from the consistency in accounting approach required by the definition of Accounting Principles, Hudson, perhaps unwittingly, actually made a significant concession:  Hudson acknowledged that "information available to [it] during the due diligence process" was relevant to the post-closing adjustment process where the SPA required it.

37.     As such, Hudson conceded that the Post-Closing Adjustment evaluation had to be based on "the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies" that ARI used pre-Closing, and which had been made available to Hudson pre-Closing.  *See* Exh. 1, at p. 1 (Definition of Accounting Principles).

38.     Notwithstanding these concessions, however, Hudson argued to RSM that it should apply RSM's view of accounting approaches to be used, regardless of whether that view was inconsistent with ARI's historical accounting practices.

39.     Hudson also succeeded in having RSM resolve a dispute – namely, whether certain of ARI's inventory was "Disposal Inventory" – that was well beyond RSM's expertise, and thus, was not a proper subject to RSM to determine under the SPA and Delaware law.

40.     The parties agreed to define Disposal Inventory in the SPA as "(i) mixed or contaminated REC Inventory or Non-R-22 Inventory that cannot be reclaimed in an economically efficient manner or which cannot be reclaimed without creating a risk of damage to equipment or a risk of harm to employees, and (ii) cylinders, which as a result of their contents or condition, cannot be reused."  *See* Exh. 1, at p. 4 (Definition of Disposal Inventory).

41.     RSM focused this issue into an alleged dispute about the refrigerant gas reclamation industry, something obviously RSM was not competent or authorized to decide.

42.     In particular, Hudson submitted to RSM a declaration of Riyaz Papar, the Director of Global Energy Services for Hudson Technologies, dated February 13, 2019 (the "Papar Declaration").

43.     In his Declaration, Mr. Papar declared his familiarity "with the chemistry and engineering principles relating to the handling, processing and separation of mixed and used refrigerant gases," and "the factors that are necessary in deciding whether it is economically efficient to process mixed and used refrigerant gases."

44.     Mr. Papar marshaled his 26-plus years of experience in mechanical engineering and the energy industry, and, based on such experience and expertise, explained the process of distillation (reclamation) and gas separation (fractional distillation).

45.     Upon explaining the relevant processes, in his Declaration, Mr. Papar provided RSM with certain determinations that he made on behalf of Hudson—including

determinations regarding the purported economic inefficiency of taking certain actions, such as (1) attempting to process mixed gases below a 70% purity threshold; (2) attempting to process azeotropic gases; and (3) attempting to process gases that are above a 70% purity where virgin gas can be purchased at a lower actual price than the cost to Hudson of processing the gas, or where the opportunity cost of using distillation capacity to process the gas is too great.

46.     But, in the Hudson Initial Submission, Hudson conceded that issues of contractual interpretation relating to the definition of Disposal Inventory and/or determinations of whether Inventory could be reclaimed in an economically efficient manner were not within the realm of the "accounting expertise" of RSM:  "Unlike some of the other adjustments at issue, the determination of what is "disposal Inventory" is not tied to the Accounting Principles….Instead, the controlling question is determining what qualifies as Disposal Inventory is simply whether the gases at issue can 'be reclaimed in an economically efficient manner.'"

47.     Airgas consistently objected to these tactics and reminded RSM of its limited authority.  For example, on March 27, 2019, Airgas submitted a Reply Submission Regarding disputed Post-closing Adjustments Proposed by Hudson to RSM ("Airgas Reply Submission").  In the Airgas Reply Submission, Airgas reminded RSM that the terms and conditions of the SPA "govern" and are "the basis for the resolution of this dispute" and that "[t]he SPA provides that both the Closing Statement and Post-Closing Adjustments shall be in accordance with the 'Accounting Principles.'"

**RSM's Exceeds its Authority in its Determination of the Post-Closing Adjustment Dispute**

48.     On June 13, 2019, RSM provided the parties with its determination of the Post-Closing Adjustment Dispute.

49.     In the RSM Determination, RSM made determinations with respect to eight specific Disputed Amounts (Item Nos. 1-8), which were categorized as follows:

| ITEM NO. | DESCRIPTION | AWARD TO HUDSON |
|---|---|---|
| Item 1 | Lower of Cost ("LCM") or Net Realizable Value ("NRV") Adjustment for R-410A | $747,701 |
| Item 2 | Lower of Cost or NRV Adjustment for UR and Mixed Gas | $2,827,700 |
| Item 3 | Disposal Costs for UR and Mixed Gas | $1,567,652 |
| Items 4 and 8 | Lower of Cost or NRV Adjustment for Retest Gas | $123,590 |
| Item 5 | Slow Moving Inventory Reserve | $633,977 |
| Items 6 and 7 | Credit Memo Transactions including Agas | $69,574 |
| **TOTAL AWARDED TO HUDSON** | | **$5,970,194** |

50.     The RSM Determination itself makes clear that RSM went outside of the limited role permitted by the SPA and Delaware law, and in doing so, committed numerous critical errors and engaged in authorized decision-making.

51.     In the refrigerant gas business, reclaiming gases is a standard practice.  The SPA defines "Disposal Inventory" to include, in part, "mixed or contaminated REC Inventory or Non-R-22 Inventory that cannot be reclaimed in an economically efficient manner *or* which cannot be reclaimed without creating a risk of damage to equipment or a risk of harm to employees."  *See* Ex. 1, at p. 4 (emphasis supplied).

52.     The RSM Determination made it clear that, acting as a judicial officer/arbitrator (not as an expert limited to "accounting expertise"), it purported to base its conclusions on the opinions and determinations provided by Hudson's purported "expert" in

the Papar Declaration on gas reclamation.  The RSM Determination even made it clear that instead of functioning in RSM's limited role of deciding discrete factual issues within RSM's accounting expertise, RSM engaged in credibility determinations on issues Hudson had admitted were outside of RSM's accounting expertise.

53.     In particular, in connection with its award of $2,917,281 to Hudson with respect to Item 2, RSM stated as follows:

> We found the declarations of Riyaz Papar to be credible and supportive of [Hudson's] position that it is not economically efficient to process: a) mixed gas less than 70% purity; b) azeotropic gas, and c) gases above a 70% purity where the cost of a particular virgin gas is less than the associated cost to process that gas. We did not find that the declaration of Benjamin Jurcik adequately refuted Riyaz Papar's claims

54.     This determination by RSM effectively reversed in whole the entire accounting methodology previously and consistently utilized by ARI in conjunction with UR and Mixed Gases and rendered all such gases Disposal Inventory under the SPA.

55.     As another example of the RSM Determination violating the parties' agreement in the SPA and established Delaware law, the RSM Determination *concludes* that certain mixed gases "cannot be reclaimed in an economically efficient manner" – even though that "factual" determination has nothing to do with RSM's limited "accounting" expertise. RSM cites matters such as lack of evidence or past reclamation and capital investment required to reclaim such mixed gases as support, but each are clearly matters of fact well beyond its limited "accounting" expertise, as well as being completely unrelated to accounting matters.  Additionally, the RSM Determination goes so far as to comment on the purported lack of certain language in the parties' SPA as purported bases for the RSM Determination. Again, this conclusively proves that RSM went well beyond its limited role of "expert" for "accounting expertise" provided by the parties' SPA.

56.     Moreover, RSM's interpretation was erroneous and not permissible because it diverged sharply from the language of the SPA, which clearly provides an *objective* test – defining "Disposal Inventory" as such inventory that "*cannot be reclaimed* in an economically efficient manner," *regardless of whether any party actually does so.*

57.     Under prevailing Delaware law, which governs the SPA, the "expert-not-arbitrator" language in Section 2.02(d)(iii) that conveyed authority to RSM to make an expert determination with respect to Disputed Amounts signaled the parties intent to limit the scope of RSM's authority to "discrete factual issues within an independent accountant's expertise."

58.     The fact that Mr. Papar's expert opinion was necessary to provide RSM with a roadmap for its determinations plainly demonstrates that the factual issues involved in making these determinations were not within RSM's expertise, and RSM went beyond the scope of its authority under the SPA.  Put simply, the issues involved in making the determinations in the RSM Determination went beyond the allowable discrete factual issues within an independent accountant's expertise that the parties intended for RSM to decide.

59.     RSM's re-accounting using *different* approaches than had been used by ARI pre-Closing demonstrates that RSM went beyond the scope of its authority under the SPA (and violated Delaware law).

60.     Moreover, the "expert-not-arbitrator" language in Section 2.02(d)(iii) did not empower RSM to rule on questions of law, or to interpret the SPA.

61.     Nevertheless, RSM did so by improperly interpreting key defined terms of the SPA.

62.     RSM improperly engaged in the legal exercise of interpreting the SPA's definition of "Accounting Principles" in making its determinations.

63.     RSM improperly engaged in the legal exercise of interpreting the SPA's definition of "Disposal Inventory" in making its determinations.

64.     Just as it did by improperly interpreting "Account Principles," RSM exceeded the scope of its authority in interpreting the term "Disposal Inventory" as well as other provisions of the SPA.

65.     In resolving the parties' dispute over the proper calculation of the Closing Balance Sheet, instead of  applying (as the SPA required) the SPA's textual definition of "Accounting Principles"—which is "GAAP applied using ***the same accounting methods, practices, principles, policies and procedures,*** with consistent classifications, judgments and valuation and estimation methodologies ***that were used in the preparation of the Annual Financial Statements for the most recent fiscal year*** . . ."—RSM rewrote the SPA's definition of "Accounting Principles" to mean GAAP applied using RSM's view of how the accounting could or should have been done.

66.     For example, the RSM Determination *ignores* ARI's historical accounting practices in connection its supply of inventory, and instead, alters the analysis (in violation of the SPA and Delaware law) to conclude that *it* considered ARI's time frame excessive as a current asset based on trailing twelve months sales.  Again, RSM's determination is not supported by and indeed, is contradicted by, ARI's historic practices and the Accounting Principles.  Again, this determination in the RSM Determination conclusively establishes that RSM went well beyond its limited role of "expert" for "accounting expertise" provided by the parties' SPA, and that RSM improperly interpreted and rejected the parties' SPA and Delaware law.

15

67.     Acting outside of its authority, and pretending as if it were the Court chosen by the parties to resolve their disputes, RSM took it upon itself to cut out of the definition of "Accounting Principles" the requirement that it use the same accounting methods, practices, principles, policies and procedures *that were actually used* by ARI in the preparation of the most recent fiscal year's Annual Financial Statements, and concluded that the Closing Balance Sheet should be calculated consistently with its view of what GAAP requires, or with its view of what ARI's historical policy required (so long as such policy was consistent with RSM's view of what GAAP required), *regardless of whether such calculations were inconsistent with the methods, practices, classifications, judgments and valuation and estimation methodologies that were actually used by ARI in the preparation of the prior year's financial statements*.

68.     Because RSM improperly undertook a function that was entirely legal in nature, its determination in the RSM Determination must be set aside, and declared null and void.

69.     What is more, RSM's misinterpretation of the SPA's definition of "Accounting Principles," which infected its determinations throughout its RSM Determination, was wrong as a matter of settled Delaware law.

70.     The Delaware Supreme Court has explained that definitions of "Accounting Principles" nearly identical to the definition the parties used in the SPA require that post-acquisition calculations require the parties to "continue using the accounting approach [seller] had been using in the normal course of business before the transaction for the calculations up to and through closing."

71.     A proper interpretation of the SPA's definition of "Accounting Principles" requires RSM to apply the accounting approach that ARI had actually used in the normal course of business in preparing the Annual Financial Statements for the prior fiscal year.

72.     Furthermore, RSM was not entitled to disregard ARI's historical accounting practices.

73.     The RSM Determination reveals that instead of applying the Accounting Principles as defined by the parties in the SPA, RSM was misled by Hudson into engaging in a re-accounting in connection with the Disputed Amounts using *different* accounting approaches than had been used by Airgas to complete the Financial Statements and pre-Closing in the Estimated Closing Statement.

**The Payment Demand**

74.     On June 17, 2019, counsel for Hudson sent a letter to Airgas and its counsel demanding, *inter alia*, a wire payment on or before June 27, 2019 of the $5,970,194 Disputed Amounts allegedly owed to Hudson pursuant to the purportedly "conclusive and binding" RSM Determination (the "Payment Demand").

75.     Since, for the reasons set forth above, Airgas contends that the RSM Determination is not "conclusive and binding" with respect to the Disputed Amounts, and that the sums identified and demanded in the Payment Demand are not properly due and owing, a dispute exists between the parties with respect to the adjustment that is to be made to the Closing Statement and/or the Post Closing Adjustment.

## <u>COUNT I – DECLARATORY JUDGMENT</u>

76.     Airgas hereby incorporates by reference all preceding paragraphs of this Verified Complaint as though the same were fully set forth herein.

77.     The SPA is a valid and enforceable contract governing the relationship between Airgas and Hudson.

78.     The SPA provides that the parties were to submit any Disputed Amounts and Undisputed Amounts to RSM for resolution consistent with the agreement and limitations set forth in the SPA.

79.     The SPA provides that RSM was authorized to "act[] as experts and not arbitrators" in resolving any Disputed Amounts and making any adjustments to the Post-Closing Adjustment.

80.     Under prevailing Delaware law, which governs the SPA, the language limiting RSM's mandate to "act[] as experts and not arbitrators" expressly limited RSM's authority to deciding "discrete factual issues within an independent accountant's expertise" with respect to any Disputed Amounts.  RSM was not permitted to rule on questions of law, RSM was not permitted to interpret the SPA and RSM was not permitted to make credibility determinations and/or factual determinations in areas outside of its discrete "accounting expertise."

81.     Despite the express limitations on its authority, RSM exceeded the scope of its mandate when it purported to resolve disputed interpretations of key defined terms of the SPA, including "Accounting Principles" and "Disposal Inventory."

82.     RSM's determinations of these purely legal questions were inconsistent with the parties' intent to limit RSM's role to that of an expert, not an arbitrator.

83.     RSM misinterpreted the defined terms "Accounting Principles" and "Disposal Inventory."

84.     In addition, RSM improperly made credibility determinations and resolved factual issues outside of its limited and discrete "accounting expertise" – the only area under the SPA it was permitted to make "expert" determinations.

85.     A proper interpretation of "Accounting Principles" requires RSM to apply the accounting approach that ARI had actually used in the normal course of business in preparing the Annual Financial Statements for the prior fiscal year, or stated differently, pre-Closing.

86.     A proper interpretation of "Disposal Inventory" requires that an objective test be applied, and that the Court, not the accounting expert, decide disputed questions of fact regarding the refrigerant gas industry.

87.     RSM's exceeding of its limited role of an expert, and the legal errors contaminating its determinations render the RSM Determination nonconclusive and nonbinding, and therefore the RSM Determination is nonconclusive and nonbinding with respect to the Disputed Amounts.

88.     The Payment Demand conveys Hudson's position that the RSM Determination is "conclusive and binding" with respect to the Disputed Amounts.

89.     Accordingly, there is an actual controversy between Airgas and Hudson with respect to whether the RSM Determination is "conclusive and binding" with respect to the Disputed Amounts.

90.     The issue is ripe for judicial determination, and a declaratory judgment clarifying the parties' respective contractual rights and obligations is appropriate.

WHEREFORE, Airgas respectfully requests that the Court enter judgment in its favor and against Hudson as follows:

a) Declaring that Section 2.02(d)(iii) of the SPA, which provides that RSM was authorized to "act[] as experts and not arbitrators" in resolving any Disputed Amounts and making any adjustments to the Post-Closing Adjustment limited RSM's authority to deciding "discrete factual issues within an independent accountant's expertise" with respect to any Disputed Amounts as limited in the SPA; and

b) Declaring that Section 2.02(d)(iii) of the SPA did not permit RSM to make decisions beyond RSM's limited authority specific to its accounting expertise, including making determinations on questions of law, interpretations of any terms of the SPA and/or resolving factual and credibility determinations outside of RSM's limited and discreet "accounting expertise;" and

c) Declaring that RSM exceeded the scope of its mandate under Section 2.02(d)(iii) of the SPA by improperly ruling on questions of law and interpreting the contractual terms "Accounting Principles" and "Disposal Inventory" and in resolving factual and credibility determinations on topics which were outside of RSM's "accounting" expertise; and

d) Declaring that RSM exceeded the scope of its mandate and committed legal error as to its analysis and application of Accounting Principles and Disposal Inventory; and

e) Declaring that, as a result of the legal errors described herein, the RSM Determination in not conclusive and binding, and that Airgas is under no obligation to pay the amount in the RSM Determination and Payment Demand; and

f) Declaring that the proper interpretation of "Accounting Principles," as that term is defined in the SPA requires RSM (and/or any other party acting as the Independent Accountants) to apply the accounting approach that ARI had actually used in the normal course of business pre-Closing; and.

g) Declaring that the proper interpretation of "Disposal Inventory" as that term is defined in the SPA is based on the application of an objective test pursuant to the intent of the parties and provided in the definition of "Disposal Inventory;" and

h) Declaring, as the plenary adjudicator of the parties' disputes outside of RSM's limited authority, that Airgas's calculation of Disposal Inventory is correct; and

i) Directing that the Post-Closing Adjustment Dispute be sent back to RSM (and/or any other party agreed-upon by the parties to act as the Independent Accountants); and

j) Directing that RSM (and/or any other party acting as the Independent Accountants) issue a determination resolving the Disputed Amounts consistent with these declarations; and

k) Granting Airgas such other and further relief as the Court deems just and proper.

**BLANK ROME LLP**

Dated: June 27, 2019          BY:     */s/ Larry R. Wood, Jr.*
                                      Larry R. Wood, Jr. (No. 3262)
                                      Adam V. Orlacchio (No. 5520)
                                      1201 N. Market Street, Suite 800
                                      Wilmington, Delaware 19801
                                      Telephone:  (302) 425-6400
                                      Facsimile:  (302) 425-6464
                                      LWood@BlankRome.com
                                      Orlacchio@BlankRome.com

                                      Martin S. Krezalek (*pro hac vice* to be filed)
                                      1271 Avenue of the Americas
                                      New York, New York 10020
                                      Telephone:  (212) 885-5130
                                      Facsimile:  (212) 885-5001
                                      MKrezalek@BlankRome.com

                                      *Attorneys for Plaintiff, Airgas, Inc.*